**Rocky Lee COKER, Appellant/Appellee,**

v.

**STATE of Tennessee, Appellee/Appellant.**

Court of Criminal Appeals of Tennessee, at Knoxville.

June 7, 1995.

No Permission to Appeal Applied for to the Supreme Court.

Michael H. Johnson, Nashville, for Appellant/Appellee.

Charles W. Burson, Attorney General and Reporter, Merrilyn Feirman, Assistant Attorney General, Nashville, Thomas J. Evans, Asst. District Attorney General, Chattanooga, for Appellee/Appellant.

## OPINION

WADE, Judge.

The petitioner, Rocky Lee Coker, filed two separate petitions for post-conviction relief. The trial court consolidated the claims, conducted an evidentiary hearing, and denied relief on the first petition while granting a new trial on the second. The petitioner appeals the trial court's denial of relief on the earlier petition; the issue presented for review is whether the trial court erred in concluding that a 1979 guilty plea had been knowingly and voluntarily entered. The state appeals the trial court's grant of relief on the latter petition claiming as follows:

(1) that the trial court erred by granting the petitioner relief upon an issue not raised by the pleadings; or

(2) that the petitioner had waived his claim of prosecutorial misconduct; or

(3) that the petitioner was not unduly prejudiced by the prosecutor's statements during closing argument.

Although we affirm the trial court's denial of relief on the first petition, we do so on different grounds. As to the second petition, we find that the evidence preponderates against the finding that prosecutorial misconduct tainted the results of the trial; and, because no prejudice resulted from any deficiencies in the performance of trial counsel, the judgment on the second petition is reversed and the cause is dismissed.

The petitioner was indicted for the October 23, 1984, killing of Cletus Price. Later, he was convicted of first degree murder in the Criminal Court of Sequatchie County. The jury sentenced the petitioner to death based upon two aggravating circumstances: that he had a prior conviction of a felony involving violence, Tenn.Code Ann. § 39–2–203(i)(2) (1982); and the murder was "for remuneration or the promise of remuneration, or employed another to commit the murder for remuneration or the promise of remuneration," Tenn.Code Ann. § 39–2–203(i)(4) (1982). During the death penalty phase of the trial, each of the three judgments under collateral attack here were apparently submitted as proof of prior convictions of felonies involving violence, thereby serving as the basis for one of the two aggravating circumstances warranting the sentence. The other aggravator was founded upon testimony that the victim's wife, Peggy Price, admitted her involvement with the petitioner in the plan to have her husband killed; there was also evidence that the petitioner hired Mic-

key Lee Davis to commit the murder. *State v. Coker*, 746 S.W.2d 167 (Tenn.1987).

## I

### (FIRST PETITION, NO. 174962)

On January 5, 1979, the petitioner entered a plea of guilt to one count of aggravated assault. The trial court imposed a sentence of "not less than two years nor more than four years." The petitioner filed an amended post-conviction petition on February 5, 1990, asserting that this guilty plea "constitute[d] a present restraint of liberty because of substantial important collateral consequences of the conviction over and above any sentence or imprisonment as a result of said guilty plea." He asserted that the plea was neither knowingly nor voluntarily entered because the trial court failed to advise him of certain of his constitutional rights identified in both *Boykin v. Alabama*, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969) and *State v. Mackey*, 553 S.W.2d 337 (Tenn.1977). He specifically alleged violations of his following rights:

(1) the right to be represented by an attorney at every stage of the proceedings, and if he could not afford one, an attorney would be appointed at state or government expense;

(2) the right to confront and cross-examine witnesses and the right to use the process and power of the court to compel the production of any evidence, including the attendance of witnesses in his favor;

(3) the right not to be compelled to incriminate himself, the right to remain silent and not testify, and that his silence could not be used against him;

(4) that if he pleaded guilty or nolo contendere, the court could ask him questions about the offenses to which he pleaded and, if he answered those questions under oath, his answers could be later used in a prosecution for perjury;

(5) that the resulting judgment of conviction could be used in a subsequent proceeding to enhance punishment for subsequent offenses;

(6) the nature of the charge to which the plea was offered;

(7) the maximum and minimum possible penalty provided by law;

(8) that if he pleaded guilty or nolo contendere that there would not be a further trial of any kind except as to the sentence so that by pleading guilty or nolo contendere, he waived the right to a jury trial;

(9) whether the petitioner's willingness to plead guilty or nolo contendere was a result of prior discussions between the District Attorney, the petitioner or his attorney; and

(10) whether a different or additional punishment could result by reasons of prior conviction(s) or other factors which could be established in the guilty plea proceedings after the entry of the plea.

The record includes a transcript of the 1979 guilty plea. At an evidentiary hearing convened over two days in the summer of 1991, the petitioner testified that the trial court had never informed him of his right to be represented by an attorney at every stage of the proceedings, his right to confront and cross-examine witnesses, and his right against self-incrimination. He claimed that the trial court failed to advise that if he pleaded guilty or nolo contendere, he would be asked questions about the offense and his answers could be used in a later prosecution for perjury. He asserted that he was not warned that the resulting judgment of conviction could be used in a subsequent proceeding to enhance punishment or that additional punishment could result because of the prior conviction. On cross-examination, however, the petitioner testified that he could not remember what he had signed when he had submitted his petition to enter a plea of guilty. While acknowledging that he had read and signed a document, he claimed that he had not understood its contents. He explained that his attorney had not discussed the document with him and that he had only been in court a few minutes.

The petitioner's trial counsel testified that it was his habit and custom to ensure his clients knew of their constitutional rights, especially the right against self-incrimination and the right to confront witnesses. He recalled that he had talked to the petitioner

about the terms of his plea agreement. He testified that his practice had been to read the petition to enter a plea of guilty to each of his clients and to discuss its terms. His general procedure was to read the certificate of counsel form to the client, to explain the nature of a waiver of the right to trial by jury, and to have clients sign the petition. He remembered that he had read the petition to plead guilty to petitioner.

On cross-examination, trial counsel acknowledged that he had lost the petitioner's file but maintained that he had a specific recollection of the guilty plea. He testified that he could "state with one hundred percent certainty ... that those documents were read word for word to [the petitioner]." He claimed to recall the general context of their conversations.

■■■ In *Boykin*, the United States Supreme Court established that the admonition of certain rights are required by the Constitution. Included among these entitlements are the right against self-incrimination, the right to confront witnesses and the right to a trial by jury. The relinquishment of those rights cannot be presumed from a silent record. *See State v. Mackey*, 553 S.W.2d 337 (Tenn.1977). In *State v. Neal*, 810 S.W.2d 131 (Tenn.1991), our supreme court established guidelines for the review of guilty pleas. While the overriding determination of the validity of the guilty plea rests upon whether it was knowingly and voluntarily entered, proof of the failure to warn of a recognized right shifts the burden of proof to the state. If the trial court substantially complies with the litany of constitutional rights mandated, there is no error. In *Johnson v. State*, 834 S.W.2d 922, 926 (Tenn.1992), our supreme court held as follows:

> [I]f the transcript shows that the petitioner was aware of his constitutional rights, he is not entitled to relief on the ground that the mandated advice was not given. Also, if all the proof presented at the post-conviction hearing, including the transcript of the guilty plea hearing, shows that the petitioner was aware of his constitutional rights, he is not entitled to relief.

■■■ In those instances where there has been a failure to comply, the error may be harmless when the state meets its burden of showing that the pleas were knowing and voluntary. A petitioner's age, level of education, intelligence, experience, general understanding of constitutional rights, his desire to avoid a greater penalty, and his representation by competent counsel at the submission hearing are all factors which might be appropriately taken into consideration. *See Blankenship v. State*, 858 S.W.2d 897, 904 (Tenn.1993); *State v. Richard Lee Sheckles*, No. 1, 1990 WL 180339 (Tenn.Crim.App., at Jackson, November 21, 1990), *perm. to appeal denied*, (Tenn.1991).

■■■ Here, the trial court found that there had been substantial compliance with the requirements of *Boykin* and *Mackey*. While we find that the record does not support that determination, we do conclude that the plea was knowingly and voluntarily made and that the constitutional error, a failure to warn of certain of his rights, was harmless beyond a reasonable doubt.

In *Neal*, the Tennessee Supreme Court articulated the difference between "substantial compliance" and "harmless error" analysis as follows:

> While we have alluded to review of *Boykin* violations as being "subject to substantial compliance and harmless error scrutiny" in *State v. Frazier*, [784 S.W.2d 927 (Tenn.1990)], we did not mean to adopt a substantial compliance doctrine that would be anything less than full compliance with the heretofore set out requirements. While absolutely literal compliance with the advice to be given is not required, expressing the sense of the substance of the required advice to a guilty-pleading defendant is. That would be substantial compliance.
>
> To further explain substantial compliance, we cite these examples. If the required advice has been correctly given by defendant's counsel, in open court in the presence of the defendant and same appears of record, that is substantial compliance, although the trial judge did not repeat the same advice. It is substantial compliance if the sense of the rights and information set out in the litany is com-

pletely stated to the guilty-pleading defendant, on the record, even though the trial judge does not use the exact script suggested. It is substantial compliance if the entire litany of rights and other required explanatory information is communicated in open court simultaneously to multiple defendants in the presence of their respective attorneys, so long as the number involved is not so great as to make individual understanding unlikely; and provided that each defendant is addressed individually to establish on the record the understanding and agreement of each defendant.

Substantial compliance is not error. Where there is substantial compliance the root purpose of the prescribed litany has been served and the guilty plea passes due process scrutiny because it was made voluntarily and understandingly.

In the context of patent omissions from the advice litany, the test which this court approves is the appropriate harmless error test. *See, State v. Newsome,* 778 S.W.2d 34 (Tenn.1989). Its validity and reasonableness could not be better illustrated than it is in this case at bar. Clearly Neal was not expressly advised of all of his rights as required by *Boykin,* but he testified upon the hearing upon his post-conviction petition that he knew those constitutional rights. Since the purpose of the litany of rights is to insure that the defendant is aware of them when he or she gives them up, no possible harm to Neal is demonstrated.

810 S.W.2d at 137–38.

Here, the transcript of the guilty plea submission hearing establishes that there had not been substantial compliance with the mandates of *Boykin.* The trial judge who accepted the plea failed to warn of the right against self-incrimination. During the evidentiary hearing, however, trial counsel provided positive testimony that he had informed the petitioner of each of his constitutional rights, particularly the right against self-incrimination and the right of confrontation. He confirmed that he had read the full contents of the petition to enter the guilty plea. The petitioner's signature is evidence of his acknowledgment of the right to jury; the right to a speedy trial; the right to confrontation; the right to compulsory process; and the right to counsel. Because there was affirmative testimony that trial counsel also explained the contents of the petition to enter the plea, the state, in our view, was able to establish by clear and convincing evidence that the plea was knowingly and voluntarily made.

■ Other arguments presented by the petitioner do not serve as a basis for relief. The failure to warn that a resulting conviction could be used to enhance his punishment in any subsequent conviction is not constitutionally based. *Housler v. State,* 749 S.W.2d 758, 760–61 (Tenn.Crim.App.1988); *see also, State v. Neal,* 810 S.W.2d at 140. Post-conviction relief can be granted only when there has been a constitutional abridgement. Tenn.Code Ann. § 40–30–105.

II

(SECOND PETITION, NO. 177708)

The petitioner also filed a second petition challenging his 1981 convictions for felonious conspiracy to commit an illegal act capable of destroying life or property and for felonious possession of explosives:

Possession, transportation or use of explosives—Conspiracy to commit illegal act capable of destroying life or property—Felony.—Where two (2) or more persons enter into an agreement to commit an illegal act capable of producing conditions destructive to life or property by the possession or transportation or use of any explosive or explosives, or to have in possession or transported any component part of an explosive or explosives such as fuses, caps, detonators, wiring, or other means of creating an explosion or explosions of an illegal nature shall be deemed guilty of a felony.

Tenn.Code Ann. § 39–1407 (1975 Repl.).

Unauthorized possession or transportation of explosives—Felony.—Except as authorized by law or regulations of the state fire marshal, any person or persons who may be found to be in possession of or to have transported any explosive or explosives, or to have in possession or transported any

component part of an explosive or explosives such as fuses, caps, detonators, wiring, or other means of creating an explosion or explosions of an illegal act capable of producing conditions destructive to life or property shall be deemed guilty of a felony.

Tenn.Code Ann. § 39–1406 (1975 Repl.).

There was no actual evidentiary hearing on this matter; petitioner's counsel argued from the record of the trial the general facts which led to the convictions in *State v. Rocky Coker and Larry Owens,* No. 766 (Tenn.Crim.App., at Knoxville, July 8, 1982), *perm. to appeal denied,* (Tenn.1982):

On July 26, 1980, at around 4:45 P.M. defendants Coker and Owens, both dressed in camouflage fatigues bearing Ku Klux Klan emblems, bought a battery at a grocery store in Chattanooga. Later that evening, a plain clothes security officer saw Coker walk into the Zayre department store on Ninth Street in Chattanooga. Coker wore camouflage fatigues, jungle boots, and a hat bearing the KKK emblem. Because there had been some racial tension in Chattanooga that summer, the security officer became concerned when he saw a white man in such dress walking through a store which had a predominately black clientele. The security officer followed Coker through the store as Coker made his way to the watch department. There Coker asked the sales clerk for a cheap alarm clock, saying he did not care what color the clock was, as long as it was cheap. The clerk sold Coker a clock and put it in a Zayre bag. The security officer then followed Coker out of the store and saw him get into a blue Ford Pinto.

At the same time, a Chattanooga police SWAT (special weapons and tactics) van pulled into the Zayre parking lot. The store security officer waived to the van and pointed at the Pinto. Chattanooga police officer Randy Dockery was driving the SWAT van at the time. When Dockery saw the Zayre security officer's signal, he turned on his siren and lights and followed the Pinto onto the street. At Ninth and Gateway Streets, the Pinto stopped for a red light, and Dockery, dressed in camou-flage fatigues himself, left the well-marked police van and approached the Pinto. But before Dockery could reach the Pinto, it sped off through the red light. Dockery radioed for help, and several squad cars arrived on the scene and were led on a high speed chase for several miles. During the chase, police saw the defendants throw several objects from the car windows. When officers fired warning shots over the car, the driver of the Pinto finally stopped. Pursuing officers found that defendant Owens had been driving the car and that Coker was in the passenger seat. Both Owens and Coker wore camouflage fatigues bearing the Klan emblem. A third co-defendant, James Ledford (whom the jury acquitted), was dressed in civilian clothes and was riding in the backseat. As they were being arrested, Owens said, "I was going to take care of the niggers for you tonight." Later Coker told police, "I was there to help you tonight, I was on your side."

Police searching the Pinto discovered the alarm clock Coker had purchased at Zayre's, a battery, a duffel bag, an M–17 gas mask, a Zayre bag, some shells and cartridges, and a bow and set of arrows. Laboratory tests revealed that the battery and Zayre bag had dynamite residue on them. Along the chase route, police found blasting caps and a stick of dynamite. With the clock, battery, blasting caps, and the dynamite, one could construct a time bomb.

Slip op. at 2–3 (footnotes omitted). The petitioner received concurrent sentences of two to four years. On direct appeal, he challenged (1) the legality of his arrest; (2) the trial court's refusal to change venue; and (3) the conduct of the jury. This court found no reversible error and affirmed each of the two convictions.

In this application for post-conviction relief, the petitioner alleged twenty-eight (28) specific instances of prosecutorial misconduct during closing argument and eight specific instances of improper jury instructions. The state denied all of the allegations and took the position that if there had been any error, it would have been harmless. On June 24,

1991, the trial court heard arguments and took the matter under advisement. In its findings of fact and conclusions of law, announced some two and one-half years later, the trial court sustained the petition, citing eleven instances of prosecutorial misconduct.

#### (A)

There are two procedural questions regarding the first issue. The state contends that the trial court erred by granting the petitioner relief based upon ineffective assistance of counsel, a ground which had initially been included in the pleadings but had been "dropped," according to the petitioner's counsel, at the beginning of the hearing. The state asserts that because the ground had been withdrawn, the trial court was powerless to grant relief. In response, the petitioner argues that because the transcript of the memorandum containing findings of fact and conclusions of law was not properly approved by the trial judge pursuant to Tenn. R.App.P. 24(f), this court may not consider the issue.

■ We will first consider the state's claim and then that of the petitioner. The Post–Conviction Procedure Act requires, among other things, petitioners to "briefly and clearly" allege the "[f]acts establishing the grounds on which the claim for relief is based." Tenn.Code Ann. § 40–30–104(a)(10). Yet, as rare as it is for trial courts to consider possible constitutional errors not raised in the petition, nothing in the statutory scheme precludes it. In fact, "[t]he scope of the hearing shall extend to all grounds the petitioner may have." Tenn.Code Ann. § 40–30–111. If there is error in the trial of a case, specifically affecting its fairness or integrity, it may be noticed *sua sponte* by the trial court or as plain error by the appellate courts. *See State v. Wooden,* 658 S.W.2d 553, 559 (Tenn.Crim.App.1983). It is a reasonable corollary that a post-conviction court, if it discovers an error of a constitutional nature, could recognize the error as a ground for post-conviction relief. *See* Tenn.Code Ann. § 40–30–105. Appellate courts, of course, may consider plain error at any time:

Plain Error.—An error which has affected the substantial rights of an accused may

be noticed at any time, even though not raised in the motion for a new trial or assigned as error on appeal, in the discretion of the appellate court where necessary to do substantial justice.

Tenn.R.Crim.P. 52(b).

A basic duty of the courts is to uphold the constitutions of both our state and that of the federal government. In view of that responsibility, we cannot conclude that the trial court committed procedural error by granting relief, either in whole or in part, on what it perceived to be ineffective assistance by trial counsel, a ground which was otherwise announced as abandoned by the petitioner's counsel during the course of the post-conviction proceeding.

■ Now we turn to the petitioner's claim that the issue raised by the state has been waived because the trial judge who conducted the evidentiary hearing failed to properly authenticate parts of the record. The transcript of the arguments made during the evidentiary hearing was submitted to the trial court on December 1, 1993. A month later, the trial court issued its oral memorandum of findings of fact and conclusions of law. The memorandum was transcribed and inserted into the record and, on March 15, 1994, the trial court certified the transcript of the evidence.

Tenn.R.App.P. 24(f) provides as follows:

The trial judge shall approve the transcript or statement of the evidence and shall authenticate the exhibits as soon as practicable after the filing thereof or after the expiration of the 15–day period for objections by appellee, as the case may be, but in all events within 30 days after the expiration of said period for filing objections. *Otherwise, the transcript or statement of the evidence and the exhibits shall be deemed to have been approved and shall be so considered by the appellate court . . . .*

(Emphasis added). By the terms of the rule, the findings of fact and conclusions of law must be considered by this court whether specifically approved by the trial judge or not. We therefore disagree with the procedural claim made by the petitioner and chose

to consider the merits of the state's argument.

 In the original petition, the petitioner claimed ineffective assistance of counsel, asserting fourteen separate instances of deficient performance. He also alleged prosecutorial misconduct and erroneous jury instructions. When, however, the petition was amended with the assistance of his appointed counsel, there were no additional claims of ineffective assistance. During the course of the evidentiary hearing, counsel announced that the petitioner had withdrawn his claims of ineffective assistance of trial counsel.

At the conclusion of the proceedings, the trial court ruled as follows:

> The serious question on the petition is the effective assistance of counsel. The petitioner here claims that the defendant's attorney allowed the prosecuting attorney to make numerous improper statements to the jury in the course of argument.

> * * * * * *

> The question here is whether defense counsel just set back and and let this be done. There was improper argument. Whether defense counsel didn't—whether it fit in with his strategy of trial or whether he didn't recognize it or whether—let's see how it stacks up there, the ones I found improper. I found one, two, three, four, five, six, seven, eight, nine, ten, eleven. *Well, this is a two-prong ground; prosecutorial misconduct and defense counsel not objecting.* Maybe three-prong, the Court not acting sua sponte. I find the petition [should] be sustained on this ground, not on other grounds.

(Emphasis added). The petitioner's counsel then volunteered to prepare the order "[s]ince the petition was sustained on prosecutorial misconduct and judicial ground...."

We interpret these comments to mean that the trial judge intended to award relief based not only upon ineffective assistance, a ground obviously withdrawn during the course of the proceeding, but also prosecutorial misconduct, an entirely separate reason for setting aside the convictions.

 Relief under the terms of the Post–Conviction Procedure Act may be granted only when "the conviction or sentence is void or voidable because of the abridgement ... of any right guaranteed by the constitution of this state or the Constitution of the United States." Tenn.Code Ann. § 40–30–105. Prosecutorial misconduct qualifies as a constitutional basis for relief. The "touchstone of due process analysis in cases of ... prosecutorial misconduct is the fairness of the trial...." *Smith v. Phillips,* 455 U.S. 209, 218, 102 S.Ct. 940, 947, 71 L.Ed.2d 78 (1982). The pleadings and proof required a judicial determination of whether the rights of the petitioner to a fair trial had been prejudiced by prosecutorial misconduct during final argument. It appears that the trial court found the due process violation to be an alternative, but equal basis for the grant of relief. So, even if the state were correct in its assertion that the petitioner was procedurally barred from relief on the ground of ineffective assistance of counsel, this court would be required to review whether the record supports the finding of prosecutorial misconduct.

### (B)

 In its second issue, however, the state claims that the petitioner had waived consideration of the prosecutorial misconduct claim by failing to present this claim to this court on direct appeal and by failing to object to the prosecutor's closing argument at trial. *See* Tenn.Code Ann. § 40–30–112. The state did not, however, raise the defense of waiver in its answer or otherwise present the defense during the course of the post-conviction proceeding. It is the statutory duty of the district attorney general to "represent the state and respond by proper pleading." Tenn.Code Ann. § 40–30–114(a). Moreover, the presumption that the defense applies is rebuttable. Tenn.Code Ann. § 40–30–112(b)(2). Because the defense of waiver was not presented, the petitioner did not have the opportunity to amend his petition or otherwise rebut the statutory presumption. It is likely that the trial court pretermitted consideration of the procedural bar when it ruled on the merits of the issue. And, because the trial court did so, we feel compelled

to consider the merits of the petitioner's claim. That, of course, precludes application of the waiver defense.

### (C)

 The state primarily asserts that the petitioner was not unduly prejudiced by the prosecuting attorney's statements during closing argument, and accordingly, that the petitioner was not entitled to relief based upon this claim. The trial court ruled that certain of the comments made by the state during closing argument were improper:

(1) Speculates on evidence: "They threw several other items out along the route which were never recovered. I don't know what they were, maybe wire, maybe more dynamite. And then once they were sure, once they were certain, they thought, that all the incriminating evidence, all the dynamite, which they knew was illegal, had been disposed of, then they elected to stop for police."

(2) Speculates on evidence: "You saw the photograph of the lump of dynamite on the battery where it sat on the floor on top of the Zayre bag and when the cap was pulled out of the stick of dynamite, quite likely, some of it fell on the floor and adhered to this battery and to the Zayre bag."

(3) Comments on personal opinion: "But I do know one thing. I know when a case has been proved. The case has been proved the last three days in this courtroom beyond any doubt."

(4) Improperly comments: "But all we did was try to introduce the evidence to you so that you could look at it, say, well, if I turned around and looked back, yeah, there's police right in the very front of it. What would my reaction be. Whether there's a gun or not, I would stay there and say what's going on."

(5) Improperly commenting on defense counsel: "When you're defending a case, you'll present any type of proof because as jurors see—I've been here for twelve years, Mr. Wild has been here for a long, long time, Mr. Seaborg has been doing it for quite awhile as prosecutor and as a defense attorney, Mr. Duval has been do-

ing it for quite a while and the thing you learn right away is that jurors come here and they come from Dupont, they come from TVA and they come from their homes as housewives and they come in here and they really don't have any experience in it and the best defense is lets get the little things and confuse them a little bit."

(6) Improperly commenting on things outside the record: "Now, we've heard a great deal and I find that jurors sometimes when I talk to them after a case, they'll say, boy, there was one thing that I was just so sick and tired of hearing about it, that I didn't want to hear about it in an argument."

(7) Improperly commenting on failure to put on proof: "You know you heard something about it cost five hundred dollars to bring a medical doctor in here to testify. You can go to Erlanger and pick up your medical records for about a dollar or maybe at the most five dollars and come in here and if the State will agree, we'll stipulate it and that was never done and we would have stipulated that if they wanted to do it."

(8) Commenting on evidence outside the record: "They were looking for dynamite. They were looking for guns. They were looking for some type of explosives. All right, so they came back later and they found them."

(9) Improperly speculates: "Because this was during the racial disturbances that were not as bad as the papers made them up to and they wanted to sell papers and TV time, wasn't that bad, but this man could have made it ten times worse, a hundred times worse, a thousand times worse."

(10) Improperly speculates, and places fear in the jury: "With the exception of, when you stop and think of the consequences of what these particular individuals could do with their leadership and their support, where they were headed and what could have happened."

(11) Improperly comments: "We don't know what else was thrown out. There may have been other sticks of dynamite they were going to use these manual fuses

with, these manual caps with and they may have thrown out the fuses, the dog wouldn't pick up, they may have thrown other wires. The only thing that dog could pick up was dynamite. There may have been a dynamite went over the bridge, that's really kind of irrelevant."

Trial courts have substantial discretionary authority in determining the propriety of final argument. Although counsel is generally given wide latitude, courts must restrict any improper commentary. *Sparks v. State*, 563 S.W.2d 564 (Tenn.Crim.App. 1978). Closing arguments must be temperate, must be based upon evidence introduced during trial, and must be relevant to the issues at trial. *State v. Sutton*, 562 S.W.2d 820 (Tenn.1978). The bounds of proper argument largely depend upon the facts in evidence, the character of the trial, and the conduct of opposing counsel. *See State v. Byerley*, 658 S.W.2d 134 (Tenn.Crim.App. 1983); *Evans v. State*, 557 S.W.2d 927 (Tenn. Crim.App.1977); and *Gaston v. State*, 506 S.W.2d 802 (Tenn.Crim.App.1973).

Both the state and the defense must be given the opportunity to argue not only the facts in the record but any reasonable inferences therefrom. *See Russell v. State*, 532 S.W.2d 268 (Tenn.1976). Confusing or irrelevant arguments should not be permitted. *Burns v. State*, 591 S.W.2d 780 (Tenn.Crim.App.1979); *Brazelton v. State*, 550 S.W.2d 7 (Tenn.Crim.App.1974).

Most restrictions during final argument are placed upon the state. That is based in great measure upon the role of the prosecutor in the criminal justice system:

[The prosecutor] is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he

may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods ... as it is to use every legitimate means....

*Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935). Also, *see Manning v. State*, 195 Tenn. 94, 257 S.W.2d 6 (1953). Thus, the state must refrain from argument designed to inflame the jury and should restrict its commentary to matters in evidence or issues at trial. The prosecutor must not express a personal belief or opinion but whether that qualifies as misconduct often depends upon the specific terminology used. For example, if argument is predicated by the words "I think" or "I submit," it is unlikely to be adjudged as a personal opinion. *United States v. Stulga*, 584 F.2d 142 (6th Cir.1978). Comments should not reflect unfavorably upon defense counsel or the trial tactics employed during the course of the trial. *See Dupree v. State*, 219 Tenn. 492, 410 S.W.2d 890 (1967); *Moore v. State*, 159 Tenn. 112, 17 S.W.2d 30 (1929); *Watkins v. State*, 140 Tenn. 1, 203 S.W. 344 (1918); and *McCracken v. State*, 489 S.W.2d 48 (Tenn.Crim.App.1972). Although there may be no commentary on the consequences of an acquittal, the prosecution may point out the gravity of a particular crime and emphasize the importance of law enforcement. *See State v. Dakin*, 614 S.W.2d 812 (Tenn.Crim. App.1980); *Bowling v. State*, 3 Tenn.Crim. App. 176, 458 S.W.2d 639 (1970).

A prosecutor is absolutely prohibited from commenting upon a decision made by the defendant not to testify at trial. *Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). That is perhaps the most significant limitation upon final argument by the state. Tennessee precludes such commentary, both by its constitution and by legislative enactment. Tenn. Const. Art. I, § 9; *Staples v. State*, 89 Tenn. 231, 14 S.W. 603 (1890); Tenn.Code Ann. § 40–17–103.

The general test to be applied to any misconduct during final argument is "whether the improper conduct could have affected the verdict to the prejudice of the defendant." *Harrington v. State*, 215 Tenn. 338, 340, 385 S.W.2d 758, 759 (1965). The

factors to assist in that determination are set out in *Judge v. State*, 539 S.W.2d 340, 344 (Tenn.Crim.App.1976), as adopted by the Tennessee Supreme Court in *State v. Buck*, 670 S.W.2d 600, 609 (Tenn.1984):

> (1) the conduct complained of, viewed in light of the facts and circumstances of the case;
>
> (2) the curative measures undertaken by the Court and the prosecutor;
>
> (3) the intent of the prosecutor in making the improper statement;
>
> (4) the cumulative effect of the improper conduct and any other errors in the record; and
>
> (5) the relative strength or weakness of the case.

We recognize that our scope of review here is limited. Generally, the factual findings of the trial court in post-conviction proceedings "are conclusive on appeal unless the evidence preponderates against the judgment." *State v. Buford*, 666 S.W.2d 473, 475 (Tenn.Crim.App.1983). There is a good reason for deference. The trial judge generally sees and hears the witnesses. That was not the case here, however. The determinations were made from the transcript of the trial. Moreover, the trial court, while identifying instances of misconduct, did not apply the factors governing whether the argument rose to the level of a constitutional abridgement.

We have carefully reviewed each of the findings of misconduct as determined by the trial judge in the context of the trial proceedings. Our review has extended to the same materials available to the post-conviction court. Our conclusions are twofold: first, that a majority of the eleven citings of misconduct do not likely rise to misconduct at all; and second, that by the application of the factors first recognized in *Judge*, those instances of misconduct would not constitute reversible error.

For example, items 1, 2, 5, 8, 10, and 11 appear to be fair comments upon the evidence. Item 9 is marginal but if it qualifies as misconduct, its effect, even in accumulation with items 3, 4, 6, and 7 would clearly not have tipped the scales of balance in the favor of the petitioner. The conduct complained of was not egregious; the conduct appeared to have had little, if any, effect and the state's case was particularly strong. The petitioner was arrested in possession of explosive devices. During the car chase, officers saw the defendant dispense of items later determined to be blasting caps and dynamite. Taken together, the materials recovered were all necessary ingredients for a time bomb.

The complete record of the trial is available. Upon review of its contents, we have weighed the factors which determine whether the prosecutor's argument rose to the level of constitutional abridgement as follows:

(1) *The conduct complained of, viewed in light of the facts and circumstances of the case:*

Counsel for each party strenuously argued their own "interpretation" of the facts based upon the evidence. Counsel for defendant Owens made comments outside the record in his closing argument about how much it would have cost to bring a doctor in to testify. Although the prosecutor's response to this comment may have also reached outside the record (item 7), we believe that the comment was relatively benign under the circumstances.

Counsel for the defendants emphasized the fact that no dynamite was found in the car or in the specific locations the dynamite was thought to have been thrown from the vehicle. The responsive argument by the state qualifies, in our view, as a fair inference from the facts.

Defense attorneys also emphasized that there was civil unrest in Chattanooga at the time of these offenses and that their clients were therefore justified in attempting to evade the arresting officers. The state's responsive argument that the riots were not as bad as the media made them out to be does not appear to be supported by facts in evidence. But the state also argued that the defendant had no real excuse for trying to avoid the police. In context, neither argument appears to have been particularly effective.

The jury returned verdicts of guilt on some charges and acquitted the defendants

on others. And, while certain comments by the prosecutor may have qualified as improper, the conduct complained of when viewed under the circumstances of this case did not, in our view, have any effect on the results of the trial. Thus, this factor is favorable to the state.

(2) *The curative measures undertaken by the court and the prosecutor:*

As noted, defense counsel did not object to the challenged arguments made by the prosecution at trial. Some objections were perhaps warranted. No curative measures were taken by the trial court during argument. Immediately following closing arguments, however, the trial court did provide the jury with its general instructions. Those instructions included the following warning:

> [T]he case must be decided solely and alone upon the evidence introduced upon the trial in open court, and not from any other source, nor upon speculation or conjecture. You will decide the guilt or innocence of each defendant from all of the testimony and evidence that has been presented to you from the witness stand and the law as given you by the Court.

Also, the prosecution began its closing arguments by asking the jury to base their verdicts upon the evidence introduced at trial and not on statements or inferences made by counsel. Under these circumstances, the factor is relatively neutral—neither favorable for the state nor favorable for the petitioner.

(3) *The intent of the prosecutor in making the improper statement:*

There is no evidence in the record that the prosecutor acted in bad faith when making the remarks complained of by the petitioner. Many of the comments were appropriate responses to the argument of the defense. Others were inferences based upon the evidence. There is no indication that those remarks crossed the line of propriety or were made with any malicious intent. This factor would thus appear to weigh favorably for the state.

(4) *The cumulative effect of the improper conduct and any other errors in the record:*

In reviewing the record as a whole, we cannot find that the cumulative effect of the improper arguments warrants the relief sought by the petitioner. The evidence, in this regard, clearly preponderates against the trial court's conclusion. The petitioner was charged with three separate crimes and convicted on two. The jury imposed two 2–4 year sentences when the maximum was ten years. A codefendant was found not guilty on all charges. There was conflicting testimony. As was its prerogative, the jury rejected portions of the state's theory and portions of the theory advanced by the defense.

Items (3), (4), (6), (7), and possibly (9) qualified as either personal opinion or argument outside of the record. Their effect appears to have been minimal. The petitioner was unable to point out any other errors in the record. The trial judge found no other error. Thus, this factor would weigh favorably for the state.

(5) *The relative strength or weakness of the case:*

Without restating in detail the evidence presented at trial, it is sufficient to say that the case was strong. Store clerks testified that the petitioner purchased a battery and an alarm clock. The petitioner and his codefendants fled when approached by the police. The police observed several articles being thrown from the defendants' car while in a high-speed chase. After arresting the petitioner and his codefendants, officers recovered an alarm clock. A bag and a battery contained dynamite residue. Officers found a box of blasting caps and a single stick of dynamite along the route of the chase. The dynamite matched the residue found on the articles recovered from the car. While certain elements of the offenses were proven circumstantially, we believe that the prosecution had a particularly strong case against the defendant. So, this factor would weigh favorably for the state.

From our extensive review, we must conclude that the closing remarks made on behalf of the state did not rise to the level of constitutional error. Apparently, the trial court chose not to make a *Judge* factor-by-factor analysis. We have done so in an effort to determine whether the record contains evidence supportive of the constitutional

abridgement. Because we have little to warrant that conclusion and we believe that the evidence preponderates against the ruling of the trial court, our holding is that relief should not have been granted based upon prosecutorial misconduct.

That brings us to the final question of whether the petitioner was denied the effective assistance of counsel. For petitioner to prove that his counsel was ineffective, he must show that the advice given or the services rendered by counsel were not within the range of competence demanded of attorneys in criminal cases. *Baxter v. Rose*, 523 S.W.2d 930 (Tenn.1975). He must also establish that but for counsel's deficient performance, the result of this trial would have been different. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Best v. State*, 708 S.W.2d 421, 422 (Tenn.Crim.App.1985).

In this instance, the burden is on the state to demonstrate that the evidence preponderates against the findings of the trial judge. *State v. Nixon*, 669 S.W.2d 679 (Tenn.Crim.App.1983); *Clenny v. State*, 576 S.W.2d 12 (Tenn.Crim.App.1978); *cert. denied*, 441 U.S. 947, 99 S.Ct. 2170, 60 L.Ed.2d 1050 (1979). Again, the trial judge's findings on questions of fact are to be given the weight of a jury verdict and are conclusive on appeal unless we find that the evidence preponderates against his findings. *State v. Nixon*, 669 S.W.2d at 682; *Clenny v. State*, 576 S.W.2d at 14.

Here, of course, the trial judge deemed the performance of counsel deficient because there were no objections made to the improper portions of the state's final argument. We agree with that assessment. Our question is whether the petitioner had established that he had been prejudiced by his counsel's failure to object. Although the trial court made no reference to the prejudice requirement, the ruling implies that the petitioner met his burden. We disagree. Again, we have carefully reviewed the evidence presented at trial, especially in its context with the final argument made by the state. From this review, we are convinced that the improprieties in the argument, while not altogether excusable, had no impact upon the verdicts.

And, as we have held, because the comments by the prosecutor had no measurable, adverse effect on the trial, no prejudice resulted to the petitioner by his counsel's failure to object. The evidence preponderates against any finding that the petitioner had been prejudiced by any deficiency in the performance of his trial counsel.

Accordingly, the judgment as to the first petition is affirmed; we reverse the judgment on the second petition and thereby deny the petitioner post-conviction relief.

PEAY and HAYES, JJ., concur.